**Adele BUZZETTI d/b/a Cozy Cabin, and Vanessa Doe, the first and last names being fictitious, Plaintiffs–Appellants,**

**v.**

**THE CITY OF NEW YORK, The Department of City Planning, The Department of Buildings, The New York City Council; Rudolph W. Giuliani, Joseph Rose and Gaston Silva, in their offical capacities, Defendants–Appellees.**

**No. 2312, Docket 97–7585.**

United States Court of Appeals, Second Circuit.

Argued July 18, 1997.

Decided March 20, 1998.

Ivan S. Alter, New York City (Alter & Alter, New York City), for Plaintiffs–Appellants.

Elizabeth S. Natrella, Assistant Corporation Counsel of the City of New York, New York City (Paul A. Crotty, Corporation Counsel of the City of New York, Leonard J. Koerner, Albert G. Fredericks, Assistant Corporation Counsels of the City of New York, New York City, Of Counsel) for Defendants–Appellees.

Before: WINTER, Chief Judge, JACOBS and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

Plaintiffs Adele Buzzetti, doing business under the name of her cabaret, Cozy Cabin, which features topless female dancers, and Vanessa Doe, a topless dancer (using a fictitious name for the purposes of this suit), appeal from the dismissal of their complaint in the United States District Court for the Southern District of New York (John S. Martin, J.) seeking declaratory and injunctive relief against the enforcement of a New York City zoning ordinance. The ordinance regulates the permissible locations of commercial establishments featuring various forms of adult entertainment. The plaintiffs argue that because the ordinance applies to female topless entertainment, but not to male topless entertainment, it violates both the First Amendment's Free Speech Clause and the Fourteenth Amendment's Equal Protection Clause. We affirm.

## BACKGROUND

Prior to November 1994, New York City's zoning law did not distinguish between adult entertainment and other commercial establishments. In late 1993, the Department of City Planning (the "DCP") undertook an "Adult Entertainment Study" (the "DCP study") to help the City Planning Commission (the "CPC" or the "Planning Commission") determine whether, like many other

municipalities, New York City should adopt zoning regulations directed at adult entertainment establishments. This study was completed in September 1994. The DCP study included both a survey of numerous studies undertaken elsewhere—including Islip, New York; Los Angeles, California; Indianapolis, Indiana; Whittier, California; Austin, Texas; Phoenix, Arizona; Manatee County, Florida; New Hanover County, North Carolina; and the State of Minnesota—and an examination of the nature and effects of adult entertainment establishments in New York City. With respect to New York City, the DCP study referred to previous studies of adult entertainment establishments conducted by other organizations, including an August 1993 Chelsea Action Coalition and Community Board 4 study and an April 1994 study by the Times Square Business Improvement District, as well as to testimony taken at an October 1993 public hearing held by the Borough of Manhattan's Task Force on the Regulation of Sex–Related Businesses. In addition, the DCP conducted its own survey of adult entertainment establishments in New York City, focusing principally on three types of establishments: adult video and book stores, adult theaters, and topless or nude bars.

Based on these sources, the DCP study concluded that adult entertainment constituted a serious and growing problem in New York City. It noted that studies from other cities had documented numerous "negative secondary impacts" of such establishments, including "increased crime rates, depreciation of property values, deterioration of community character and the quality of urban life." DCP Study at 67. These effects were consistent with the experience of those areas of New York City marked by high concentrations of adult entertainment establishments, the study concluded. Even in areas where adult establishments were not heavily concentrated, residents, businesses, and community leaders feared the consequences of possible future proliferation. The DCP study found that there had been a sharp increase in the overall number of adult entertainment establishments in New York City in the previous 10 years, including a 26 percent increase in topless/nude bars. The DCP there-

fore recommended special zoning restrictions on adult entertainment.

In November 1994, the New York City Council approved a one-year interim zoning moratorium on the opening or enlargement of adult establishments. In March 1995, the DCP and the New York City Council Land Use Committee filed a joint land use review application to amend the city's zoning law to establish permanent zoning regulations applicable to adult establishments. After receiving comments from the city's five borough boards and 39 community boards, and after holding its own public hearings, the CPC approved the proposed permanent regulations on September 18, 1995. Based on the DCP study, other reports, and public testimony, the Planning Commission concluded that there were "substantial adverse secondary effects stemming from the location and concentration of adult uses" in New York, including "the negative impact adult establishments have on economic development and revitalization; their tendency to decrease property value, thereby limiting tax revenue; [the] impediment [created] to economic activity; their tendency to encourage criminal activity, particularly when the establishments are located in concentration; the proliferation of illegal sex-related businesses; their damaging impact on neighborhood character and residents including children; and the costs associated with maintaining and patrolling areas." Following additional public hearings, on October 25, 1995, the City Council approved the permanent restrictions, effective immediately. It is this set of permanent zoning restrictions ("the Zoning Amendment" or "the Amendment") that are at issue in this case.

The Zoning Amendment does not forbid the operation of any category of business. Instead, it restricts the areas in which certain sexually-oriented businesses may operate. The Zoning Amendment's regulatory scheme applies to all "adult establishment[s]," which is defined to mean a commercial establishment, a "substantial portion" of which is used as: an "adult book store," an "adult theater," an "adult eating or drinking establishment," or some "other adult commercial establishment" (or some combination

of these). Zoning Amendment, § 12–10. Businesses fall into one of these categories of "adult establishments" if they "regularly feature" or devote a "substantial portion" of their business to entertainment or material emphasizing "specified anatomical areas" or "specified sexual activities." *Id.* For example,

> An adult eating or drinking establishment is an eating or drinking establishment which regularly features any one or more of the following:
>
> > (1) live performances which are characterized by an emphasis on "specified anatomical areas" or "specified sexual activities"; or
> >
> > . . .
> >
> > (3) employees who, as part of their employment, regularly expose to patrons "specified anatomical areas." and
>
> which is not customarily open to the general public during such features because it excludes minors by reason of age.

*Id.* And:

> An adult theater is a theater which regularly features one or more of the following:
>
> > . . .
> >
> > (2) live performances characterized by an emphasis on "specified anatomical areas" or "specified sexual activities", and
>
> which is not customarily open to the general public during such features because it excludes minors by reason of age.

*Id.*

For purposes of this appeal, the following two definitions are pivotal:

> "specified sexual activities" are: (i) human genitals in a state of sexual stimulation or arousal; (ii) actual or simulated acts of human masturbation, sexual intercourse or sodomy; or (iii) fondling or other erotic touching of human genitals, pubic region, buttock, anus or *female* breast.
>
> "Specified anatomical areas" are: (i) less than completely and opaquely concealed: (a) human genitals, pubic region, (b) human buttock, anus, or (c) *female* breast below a point immediately above the top of the areola; or (ii) human male genitals in a

> discernibly turgid state, even if completely and opaquely concealed.

*Id.* (emphasis added).

Based upon these definitions, the Zoning Amendment regulates the locations at which adult establishments may operate. In addition to the general ban on commercial establishments in residentially-zoned areas of New York City, the Amendment completely forbids adult establishments from operating in certain other specified areas of the city. *See* Zoning Amendment, §§ 32–01, 42–01. Moreover, in those areas where adult establishments are permitted to locate, the establishments, subject to certain exceptions, may not be located within 500 feet of any school, day care center, or house of worship, nor within 500 feet of the edge of most residential areas. *See id.* In addition, to prevent concentration of adult establishments, the Zoning Amendment generally provides that no adult establishments may be located within 500 feet of any other adult establishment. *See id.* A one-year transition period (with the possibility of additional extensions of time) is provided for non-conforming adult establishments existing at the time of enactment of the Zoning Amendment.

On October 10, 1996, the plaintiffs-appellants filed a complaint alleging that the Zoning Amendment violated the Equal Protection Clause and the First Amendment, and sought injunctive and declaratory relief on that basis. The complaint alleged that Buzzetti's cabaret, Cozy Cabin, which regularly features barechested female dancers, would be economically unable to relocate as required by the Zoning Amendment and therefore would be forced to close. In addition, the complaint alleged that plaintiff Doe is a topless dancer, and that the Zoning Amendment will restrict her ability to earn a livelihood, as well as her ability to express herself through her dancing.

The district court denied plaintiffs' motion for a preliminary injunction, finding that they had not demonstrated a likelihood of success on the merits of their constitutional claims. *See Buzzetti v. City of New York,* 96 Civ. 7764, 1997 WL 164284, at *6 (S.D.N.Y. April 8, 1997). Relying on *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct.

2440, 49 L.Ed.2d 310 (1976) and *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the district court determined that the New York ordinance was not viewpoint-discriminatory, but rather constituted "a content-neutral time, place, and manner regulation" and, as such, passed constitutional muster if it " 'is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication.' " *Buzzetti*, 1997 WL 164284, at *3 (quoting *Renton*, 475 U.S. at 50, 106 S.Ct. at 930). This test was met because, the court found, New York's "interest in preventing crime, maintaining property values, and preserving the quality of the city's neighborhoods is both important and substantial" and "the Zoning Amendment also provides for reasonable alternative avenues of communication in numerous zoning districts throughout the city." *Id.* The district court also concluded that the Zoning Amendment did not run afoul of the Equal Protection Clause as "gender-biased." The court noted that the ordinance was aimed at the secondary effects produced by adult entertainment, and "in our culture the public display of female breasts will have far different secondary effects than the public display of male breasts. Rightly or wrongly, our society continues to recognize a fundamental difference between the male and female breast." *Id.* at *4. Finally, citing *Williamson v. Lee Optical Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), the court noted the broad discretion afforded legislative bodies in determining which aspects of general social problems should be targeted for regulation. *See id.* at *5.

Having denied the plaintiffs a preliminary injunction, the district court, pursuant to the parties' joint stipulation, entered final judgment denying plaintiffs' claims for declaratory and injunctive relief and dismissing plaintiffs' complaint. Plaintiffs brought this appeal contending that the Zoning Amendment violates the First Amendment because its regulation of female topless dancing, but not male topless dancing, constitutes a viewpoint-based restriction on expression suppressing the viewpoint of "female eroticism." In addition, they argue, the Zoning Amendment's differential treatment of male and female topless dancers constitutes a gender-based classification that cannot survive equal protection scrutiny.

## DISCUSSION

### I. First Amendment Claim

■ The district court correctly relied on *Young* and *Renton*. Both cases involved ordinances substantially similar to New York City's Zoning Amendment; each ordinance regulated adult business establishments based upon essentially the same definitions of "Specified Sexual Activities" and "Specified Anatomical Areas" as the New York Zoning Amendment, including the differential treatment of male and female toplessness. *See Young*, 427 U.S. at 53 n. 4, 96 S.Ct. at 2444 n. 4; *Playtime Theaters, Inc. v. City of Renton*, 748 F.2d 527, 529 n. 1 (9th Cir.1984), *rev'd*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). In *Young*, the Court upheld Detroit's adult film zoning ordinance, despite the fact that it singled out one category of expression for special regulation. A plurality of the Court placed importance on the fact that the expression at issue was far from the "core" of First Amendment protections, noting that "even though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate." *Young*, 427 U.S. at 70, 96 S.Ct. at 2452 (plurality); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991) (plurality opinion) (quoting language from previous cases "support[ing] the conclusion ... that nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so.").

Thus, the *Young* Court held, "[e]ven though the First Amendment protects communication in this area from total suppression ... the State may legitimately use the content of these materials as the basis for placing them in a different classification from

other motion pictures." *Young,* 427 U.S. at 70–71, 96 S.Ct. at 2452 (plurality). Stressing that "the city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems," the *Young* plurality concluded, with specific reference to Detroit's ordinance, that "[s]ince what is ultimately at stake is nothing more than a limitation on the place where adult films may be exhibited, even though the determination of whether a particular film fits that characterization turns on the nature of its content, we conclude that the city's interest in the present and future character of its neighborhoods adequately supports its classification of motion pictures." *Id.* at 71–72, 96 S.Ct. at 2453 (footnote omitted).

*Renton* built directly upon the *Young* framework. The dissent in *Renton* argued that the adult zoning ordinance at issue "discriminate[d] on its face against certain forms of speech based on content" because its restrictions applied only to theaters showing a certain kind of material—*i.e.,* sexually explicit films. *See Renton,* 475 U.S. at 57–58, 106 S.Ct. at 934 (Brennan, J., dissenting). The majority rejected this view. It acknowledged that "regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment," and that "the [Renton] ordinance treats theaters that specialize in adult films differently from other kinds of theaters." *Renton,* 475 U.S. at 46–47, 106 S.Ct. at 928–29 (citations omitted). The *Renton* majority nonetheless viewed the ordinance as content-neutral; "as the District Court concluded, the Renton ordinance is aimed not at the *content* of the films shown at 'adult motion picture theatres,' but rather at the *secondary effects* of such theaters on the surrounding community." *Id.* at 47, 106 S.Ct. at 929.

In reaching this conclusion, the Supreme Court looked to the overall purpose of the ordinance. Whereas the district court had found the Renton City Council's " '*predominate* concerns' [in enacting the ordinance] were with the secondary effects of adult theaters, and not with the content of adult films themselves," the court of appeals had applied a more stringent test, under which "if '*a*

*motivating factor* ' in enacting the ordinance was to restrict respondents' exercise of First Amendment rights the ordinance would be invalid, apparently no matter how small a part this motivating factor may have played in the City Council's decision." *Id.* (citations omitted). According to the Supreme Court, the court of appeals had erred in not looking to the overall purpose of the ordinance:

> The District Court's finding as to "predominate" intent, ... is more than adequate to establish that the city's pursuit of its zoning interests here was unrelated to the suppression of free expression. The ordinance by its terms is designed to prevent crime, protect the city's retail trade, maintain property values, and generally "protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life," not to suppress the expression of unpopular views.

*Id.* at 48, 106 S.Ct. at 929 (alterations in original). As a result, the Court ruled,

> the Renton ordinance is completely consistent with our definition of "content-neutral" speech regulations as those that "are *justified* without reference to the content of the regulated speech." ... The appropriate inquiry in this case, then, is whether the Renton ordinance is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication.

*Id.* at 48, 50, 106 S.Ct. at 929, 930 (citations omitted).

The appellants argue that *Young* and *Renton* are distinguishable because neither addressed the issue whether the differential treatment of male and female toplessness constituted an impermissible viewpoint restriction. In considering this argument, we need not decide whether appellants have accurately characterized female topless dancing as conveying, for First Amendment purposes, the "viewpoint" of "female eroticism." For even assuming the correctness of plaintiff's contention, we do not think that the Zoning Amendment represents an attempt by New York City to disfavor the viewpoint of female eroticism.

We recognize that "[v]iewpoint discrimination is ... an egregious form of content

discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995).

We think it clear, however, that the viewpoint of "female eroticism" did not constitute New York City's "rationale for the restriction[s]" in the Zoning Amendment. As the district court found, "the record does not indicate that the city was aiming to suppress free expression or to disadvantage women who want to perform barechested, as opposed to similarly situated men. Rather, after careful study the city decided to regulate the zoning rights of adult establishments in an effort to address the negative impact such establishments have on the surrounding community." *Buzzetti,* 1997 WL 164284, at *3. Moreover, the Zoning Amendment by its terms applies both to male and female erotic dancers. All but one of the defined "specified sexual activities" apply to males as well as females, and all but one of the defined "specified anatomical areas" apply to males, as well. Moreover, the definition of "specified anatomical areas" also singles out "male genitals in a discernably turgid state." Zoning Amendment, § 12–10. In sum, we agree with the district court that the Zoning Amendment is not aimed at suppressing the viewpoint of female eroticism, and is properly viewed, under *Renton,* as a content-neutral time, place, and manner regulation.

We therefore uphold the New York ordinance. With respect to the first requirement for upholding content-neutral regulations, the Supreme Court has made clear that concerns similar to those advanced by New York City, such as preventing crime, maintaining property values, and preserving the quality of urban life and the character of city neighborhoods, constitute "substantial governmental interest[s]." *See Renton,* 475 U.S. at 48, 50, 106 S.Ct. at 929, 930; *see also Young,* 427 U.S. at 71, 96 S.Ct. at 2453 (plurality) ("[T]he city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect."). In addition, *Renton* emphasized that city officials were not required to make particular findings regarding the secondary effects of adult entertainment in Renton itself, but rather were "entitled to rely on the experiences of ... other cities." *Renton,* 475 U.S. at 51, 106 S.Ct. at 931; *see id.* at 51–52, 106 S.Ct. at 931 ("The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses."). Thus, New York City's reliance on studies from a variety of other areas of the country was well-placed. But, as indicated above, New York City went beyond this minimal requirement: the DCP conducted its own detailed study, consulted other studies conducted in particular neighborhoods of New York City, and considered testimony given at public hearings in New York. As the District Court found:

> The city has adequately documented the evidence supporting its decision to enact a zoning regulation to help counter the negative secondary effects it believed were caused by adult establishments throughout New York City.... Such impacts include increased crime, reduced property value, and a perceived decline in the community character. The negative secondary effects associated with adult establishments and relied on as the impetus for the Zoning Amendment were extensively studied and documented before the Ordinance was adopted.... Defendants' interest in preventing crime, maintaining property values, and preserving the quality of the city's neighborhoods is both important and substantial.

*Buzzetti,* 1997 WL 164284, at *3 (footnote omitted).

Finally, there can be no doubt on this record that the Zoning Amendment allows for "reasonable alternative avenues of communication." The *Renton* Court noted that because the Renton ordinance left "some 520 acres, or more than five percent of the entire land area of Renton, open to use as adult theater sites," even though little or none of it

might be " 'commercially viable,' " "reasonable alternative avenues" remained. 475 U.S at 53–54, 106 S.Ct. at 932. In comparison, as the district court found in the instant case, "Eleven percent of New York City's total land area remains as permissible locations for adult establishments to operate. The Zoning Amendment certainly allows for alternative sites for adult establishments to operate." *Buzzetti,* 1997 WL 164284, at *5 n. 13. Furthermore, the DCP has estimated that the Zoning Amendment "allow[s] for the operation of approximately 500 adult establishments in New York City" in comparison to the approximately 177 adult establishments currently operating in the city; "[a]ccordingly, the Amendment[ ] permit[s] all of the City's existing adult establishments to continue to operate in the City, either at their current sites or at new locations." *See also Stringfellow's of New York, Ltd. v. City of New York,* 91 N.Y.2d 382, 401–04, 671 N.Y.S.2d 406, 417–18, 694 N.E.2d 407 (1998) (uncorrected slip op.).

We therefore agree with the district court, under the authority of *Young* and *Renton,* that the New York City Zoning Amendment is a content-neutral time, place, and manner regulation, is justified by substantial government interests and allows for reasonable alternative avenues of communication, and, accordingly, does not violate the First Amendment.

## II. Equal Protection Claim

■ Appellants also argue that the Zoning Amendment's differential regulation of male and female topless dancing constitutes an invidious gender distinction, in violation of the Equal Protection Clause. The Supreme Court has recently "summarize[d] the Court's current directions for cases of official classification based on gender" as follows:

Focusing on the differential treatment or denial of opportunity for which relief is sought, the reviewing court must determine whether the proferred justification is "exceedingly persuasive." The burden of justification is demanding and it rests entirely on the State. The State must show "at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' " The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.

*United States v. Virginia,* 518 U.S. 515, ──, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996) (alteration in original) (citations omitted).

"It is clear that '[g]ender has never been rejected as an impermissible classification in all instances.' " *Rostker v. Goldberg,* 453 U.S. 57, 69 n. 7, 101 S.Ct. 2646, 2654 n. 7, 69 L.Ed.2d 478 (1981) (quoting *Kahn v. Shevin,* 416 U.S. 351, 356 n. 10, 94 S.Ct. 1734, 1737–38 n. 10, 40 L.Ed.2d 189 (1974)). The Court recently reaffirmed in *Virginia* that "[t]he heightened review standard our precedent establishes does not make sex a proscribed classification.... Physical differences between men and women ... are enduring: [T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both." *Virginia,* 518 U.S. at ──, 116 S.Ct. at 2276 (alterations in original) (internal quotation marks and citations omitted).

Thus, the Court has noted that "because the Equal Protection Clause does not demand that a statute necessarily apply equally to all persons or require things which are different in fact ... to be treated in law as though they were the same, this Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 469, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981) (plurality opinion) (internal quotation marks and citations omitted). Statutes that fairly can be seen as responding to clear sexual differences between men and women are among those laws that courts have upheld, despite the gender-based classifications contained in them. *See, e.g., id.* at 471–73, 101 S.Ct. at 1205–06 (upholding statutory rape law de-

signed, *inter alia*, to prevent illegitimate teenage pregnancies under which only men could be held criminally liable because "[o]nly women may become pregnant, and they suffer disproportionately the profound physical, emotional and psychological consequences of sexual activity"; the statute was thus "sufficiently related to the state's objectives to pass constitutional muster"); *Liberta v. Kelly*, 839 F.2d 77, 82–83 (2d Cir.), *cert. denied*, 488 U.S. 832, 109 S.Ct. 89, 102 L.Ed.2d 65 (1988) (upholding, against equal protection challenge, a New York rape statute criminalizing coerced intercourse with females by males, but not coerced intercourse with males by females; "we find it inconceivable that males who rape should go free solely because the legislature focused on a real problem, rape of women by men, with verified attendant physical and psychological trauma, and failed to act on a hypothetical problem, rape of men by women"); *United States v. Davis*, 785 F.2d 610, 614 (8th Cir. 1986) (same; citing cases).

Applying these principles to the Zoning Amendment, we conclude that, for the reasons stated in our discussion of appellants' First Amendment claim, New York City's objectives of preventing crime, maintaining property values, and preserving the quality of urban life, are important. We also believe that the Zoning Amendment's regulation of female, but not male, topless dancing, in the context of its overall regulation of sexually explicit commercial establishments, is substantially related to the achievement of New York City's objectives.

■ In this latter connection, we note first that under the Supreme Court's tests for gender classifications, "[t]he relevant inquiry ... is not whether the statute is drawn as precisely as it might have been, but whether the line chosen by the [legislature] is within constitutional limitations." *Liberta*, 839 F.2d at 83 (quoting *Michael M.*, 450 U.S. at 473, 101 S.Ct. at 1206 (plurality opinion)) (alterations in *Liberta*). Here, as described above, New York City officials, in addition to canvassing numerous prior studies regarding the secondary effects of adult establishments, also conducted their own study of the problem in New York. One of the adult establish-

ments surveyed as part of the DCP study was, as appellants put it, "the well-known male topless bar Chippendales." *See* DCP Study, Appendix B. After reviewing the results of the DCP study, as well as other studies and public testimony, the city "carefully drafted" the Zoning Amendment "to cover only the types of establishments that have been found to produce negative impacts on the communities in which they are located," according to Joseph B. Rose, the Chairman of the CPC and the Director of the Planning Commission. Rose's uncontradicted affidavit also indicates that "the vast majority of topless clubs in New York City employ female entertainers exclusively" and "[a]ccording to studies conducted in New York and in other municipalities, ... it is those clubs that tend to produce negative impacts, such as a reduction in the value of nearby properties and an impairment in the character of the surrounding community." Having thoroughly examined the problems of adult entertainment, the DCP, Rose reported, "has no evidence that [male topless clubs] create the type of negative community impacts that the adult establishments covered by the Amendment[ ] tend to produce."

In short, New York City carefully studied the contours of the problem it was seeking to address and legislated in accordance with its findings. "We simply have no basis on this record for assuming that [New York] will not, in the future, amend its ordinance to include other kinds of adult businesses that [are] shown to produce the same kinds of secondary effects." *Renton*, 475 U.S. at 53, 106 S.Ct. at 931–32.

Moreover, as the district court pointed out in support of its conclusion that the Zoning Amendment was not gender-biased, numerous courts have recognized that the societal impacts associated with female toplessness are legitimate bases for regulation. *See, e.g., United States v. Biocic*, 928 F.2d 112, 115–16 (4th Cir.1991) (upholding a public indecency statute that applied to topless females but not topless males, and noting that, in our society, the "erogenous zones .... still include (whether justifiably or not in the eyes of all) the female, but not the male, breast"). Indeed, courts have considered, and rejected,

equal protection challenges quite similar to Buzzetti's and Doe's, against adult entertainment regulations like New York City's Zoning Amendment. *See, e.g., SDJ, Inc. v. City of Houston,* 837 F.2d 1268, 1279–80 (5th Cir. 1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989) (considering a similar ordinance regulating adult entertainment, and concluding that "[t]he district court did not err in holding that such regulation of female breasts is substantially related to the City's interest in regulation"); *Tolbert v. City of Memphis,* 568 F.Supp. 1285, 1290 (W.D.Tenn.1983) ("The only aspect of the ordinance at issue in this case that could be construed as discriminating against women on its face is directed solely against the exposure of the female breast in a public place. In our culture, for the purpose of this type [of] ordinance, female breasts are a justifiable basis for a gender-based classification."); *cf. Hang On, Inc. v. City of Arlington,* 65 F.3d 1248, 1256–57 (5th Cir.1995) (rejecting a challenge brought under the Texas Equal Rights Amendment to a similar ordinance).

Given New York City's objective, which is not to oppress either gender's sexuality but to control effects that flow from public reaction to the conduct involved, we must recognize that the public reactions to the exhibition of the female breast and the male breast are highly different. The male chest is routinely exposed on beaches, in public sporting events and the ballet, and in general consumption magazine photography without involving any sexual suggestion. In contrast, public exposure of the female breast is rare under the conventions of our society, and almost invariably conveys sexual overtones. It is therefore permissible for New York City, in its effort to achieve the objectives of the Zoning Ordinance, to classify female toplessness differently from the exhibition of the naked male chest. This does not constitute a denial of equal protection.

Finally, although we need not rest our decision on this basis, we note that, given the city's findings, regulating both male and female topless entertainment might have burdened more expressive activity than necessary, thus creating potential First Amendment problems. For example, in *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), the Court struck down an ordinance banning all live entertainment within the Borough of Mount Ephraim, New Jersey. "Even if Mount Ephraim might validly place restrictions on certain forms of live nude dancing under a narrowly drawn ordinance, this would not justify the exclusion of all live entertainment...." *Id.* at 73 n. 15, 101 S.Ct. at 2185 n. 15. Mount Ephraim's ordinance regulated too much speech because "[t]he Borough has presented no evidence, and it is not immediately apparent as a matter of experience, that live entertainment poses problems of this nature more significant than those associated with various permitted uses; nor does it appear that the Borough's zoning authority has arrived at a defensible conclusion that unusual problems are presented by live entertainment." *Id.* at 73, 101 S.Ct. at 2185. Similarly, in *Erznoznik v. Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), the Court invalidated an ordinance prohibiting drive-in movie theaters from showing films containing nudity when the screen was visible from a public street or place. Insofar as the ordinance was aimed at prohibiting youth from viewing the films, it regulated too much expression. "The ordinance is not directed against sexually explicit nudity, nor is it otherwise limited. Rather, it sweepingly forbids display of all films containing any uncovered buttocks or breasts, irrespective of context or pervasiveness. Thus it would bar a film containing a picture of a baby's buttocks, the nude body of a war victim, ... scenes from a culture in which nudity is indigenous [or] shots of bathers on a beach.... Clearly all nudity cannot be deemed obscene even as to minors." *Id.* at 213, 95 S.Ct. at 2274–75 (emphasis omitted).

Referring to these precedents, the Court pointed out in *Renton* that "the Renton ordinance is 'narrowly tailored' to affect only that category of theaters shown to produce the unwanted secondary effects, thus avoiding the flaw that proved fatal to the regulations in *Schad* ... and *Erznoznik* ...." *Renton,* 475 U.S. at 52, 106 S.Ct. at 931; *see also Young,* 427 U.S. at 82, 96 S.Ct. at 2458

**144**

(Powell, J., concurring in part and concurring in the judgment) ("The evidence presented to the Common Council indicated that the urban deterioration was threatened, not by the concentration of *all* movie theaters with other 'regulated uses,' but only by a concentration of those that elected to specialize in adult movies. The case would present a different situation had Detroit brought within the ordinance types of theaters that had not been shown to contribute to the deterioration of surrounding areas.") (footnotes omitted). By implication, if, after conducting a thorough examination in which only topless entertainment by female performers was "shown to produce" the unwanted secondary effects, New York City nonetheless regulated male topless entertainment, the City might have violated the First Amendment.

In any event, we conclude that appellants have shown no equal protection violation. The Zoning Amendment is substantially related to the City's important objectives in controlling the secondary effects of adult entertainment, and the City has provided the "exceedingly persuasive" justification for its differential regulation of male and female topless performances required under *Virginia.* " '[T]he gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated' in this case." *Rostker*, 453 U.S. at 79, 101 S.Ct. at 2659 (quoting *Michael M.*, 450 U.S. at 469, 101 S.Ct. at 1204 (plurality opinion)).

### CONCLUSION

The judgment of the district court is affirmed.